## Commonwealth ex rel. Fox v. Fox

*Stephen S. Smith,* for relator.

*Robert F. Kelly,* for relatrix.

DIGGINS, P. J., January 10, 1972.—This is a habeas corpus petition for custody of minor children filed by Henry D. Fox, the father, against the mother, Kathleen L. Fox. A hearing was held on August 9, 1971, and at the conclusion thereof the court remanded the children to the custody of relator, Henry D. Fox, with an order granting relatrix, Kathleen L. Fox, the right of visitation with the children every weekend and dividing the holidays between the father and the mother, granting the mother possession of the children for five consecutive weeks without interruption in the summertime, and requiring the father to pay the mother $6.50 per day for the days when the mother has the children.

The testimony adduced at the hearing disclosed that the children, Richard and David, are respectively 10 and 5 years of age. Relator testified that the mother started to neglect the children when she started work-

ing at the Franklin Mint on the night shift and that she left the common abode in 1967 and remained away until 1969, a period of 18 months. This abandonment began when relatrix started coming home late from the night shift, sometimes at 2 or 2:30 a.m. Frequently relator was required to work the night shift beginning at about midnight, during which time the mother was expected home about 10:30 or 11 o'clock. Often she would not get in until much later, then she said she had been out with the girls. When the father worked the last shift, midnight until eight, he would have to take care of the children and the house, which was constantly neglected, and at other times the mother would not be up in the morning when the father returned at 8 a.m., and he would have to take over all the household duties and the management of the children. He had to prepare the meals, buy all the food, do the laundry, purchase clothing, pack the older son's lunch daily and clean the house. There was a further serious inconvenience to the father because the children needed supervision and the father was afraid to leave the children alone while he went to bed, because on one occasion a fire had been started by the boys, and he would stay up with the children until relatrix got out of bed.

In October of 1969, the wife left the home, she said, in order to shock her husband into realizing how much he needed her. She did not tell him of her intention nor did she leave any information about her purpose or whereabouts. There is a difference in the testimony relating to the visits the mother made during her 18-months' absence. The father testified the mother came at most twice a week, sometimes less, and oftentimes she did not even see the boys. The wife testified she saw them as often as she could and that oftentimes the father had the boys out when she did call but the

father had no means of knowing when or if the mother would come.

The father procured a housekeeper and when the wife returned after 18 months' absence, he continued to keep the housekeeper because the wife's conduct was much the same and the children had to be cared for. This did not work out and the wife left again. She complained about the housekeeper but the only instance that substantiated her complaint was that the housekeeper strapped the younger son to a kitchen chair to require him to sit there as a matter of discipline on one occasion. When she left the second time, she took the children to an apartment. At the time of the hearing, she was not working but was receiving $60 per week unemployment compensation plus $35 a week from her husband. She testified that she had the children enrolled in school and sees to their religious education. The father had instituted an action for divorce.

She complained that once when she had the children, she asked the father to take them on July 4th because he could give them a better time, but he did not do this. She admitted that she did not always come directly home from work but was always in "mixed" company.

The evidence discloses, as the court sees this, that the real concern for the welfare of the children in this case is in the father and the court found as a fact from the evidence that from a very early period in the marriage, relatrix shirked her duty toward the family and more and more of these duties fell on relator and he had to act as both mother and father, and more than two years ago, the duties became too much and relatrix found release in an outside job. The court feels that the mother loves these children, but as a wife, mother and housekeeper she is inadequate. The father has

always offered so much more than the mother, stability, love and concern, and he implemented this by giving all his free time to these children and he has done it for years while taking care of the house, the laundry, the food and caring for the children. The court was persuaded that the basic motive of relatrix in wanting these children is economic, that she made a mistake in leaving her husband and home and would like now to return, and failing that, wants the money she would get from him for the support of the children, because obviously she cannot maintain herself and an apartment large enough for the children in her present economic status, and further, the court was of the opinion that the mother took these children in order to have a lever to effect a reconciliation, knowing of the father's desire to have a normal life with his children.

There was testimony that by innuendo suggested a mental problem on the part of the mother but the court rejected this. In the opinion of the trial judge, it was a matter of inadequacy. This court found that the father was able and willing to provide a stable home and security, and in making the order the court said:

"It is the children who will suffer. I would just hope that she would understand that I am charged with the overriding concern, the best interests of the children. I think it is my duty to preserve for them a home that is going to be there every day. I think she loves these children deeply, I think she should be given every opportunity to develop that, but I cannot force Mr. Fox to take her back; and if what he says the history is of the home from the time they were married until she left, I wouldn't expect him to take her back. I don't think she really wants to go back, from the standpoint of love and affection for him."

However, the court stated that it wanted to give her as much opportunity to foster the love and respect of these children in her and, therefore, made the order with generous visitation rights in the mother. The court feels that one of the most important concepts in the life of growing children is a sense of security. In this case it could be alone found with the father and the court felt that the mother knew this when she took the children, but, for the reasons suggested above, she submerged their interests to her own. Counsel for relatrix urged on the court that the neglect on the part of relator occurred because she was working. However, the record discloses that the neglect began long before she was working and she was neglecting the children, the house and her husband, forcing him to be both father and mother, and she sought work on her own volition out of the house because it was more appealing than housework and the responsibilities of a family. It is true that the husband did not object to her going to work, although they did not need the money to pay the bills. It would appear that it eased the situation all around if the mother was out of the house. Counsel for relatrix makes much of the fact that she wants to go back into the house. The court felt that she did, but it was for economic reasons and because she realized that her conduct had caused her to lose her home and the father refused to go through the same again.

This court is not unmindful of the philosophy of the law that a child of tender years should be committed to the care and custody of its mother unless there are compelling reasons to the contrary. Children 10 and 5 years of age, while very young indeed and needing care and security, are not infants. Counsel for the mother relies very much on what he urges is a presumption in the law that a mother has a prima facie

right to her children over any other person and cites cases on precisely that point. We do not dispute this but it is, and always has been, a refutable presumption, and there are many cases which recognize the principle of the mother's rights in the absence of compelling reasons to the contrary and yet have sustained award of custody in the father: Commonwealth ex rel. Williams v. Price, 167 Pa. Superior Ct. 57, 74 A. 2d 668; Commonwealth ex rel. Bordlemay v. Bordlemay, 201 Pa. Superior Ct. 435; Commonwealth ex rel. Doberstein v. Doberstein, 201 Pa. Superior Ct. 102; Commonwealth ex rel. McLeod v. Seiple, 193 Pa. Superior Ct. 131.

In the case of Commonwealth ex rel. Sheftic v. Sheftic, 178 Pa. Superior Ct. 649, 654, with President Judge Ervin speaking for the court, it was said:

"The usual rule of law to the effect that it is preferable that the custody of a child of tender years be given to the mother is not applicable to this case because when this child most needed the mother's care, it was not provided. At that time, mother was more interested in seeking her own pleasure."

Since June 22, 1971, the trial courts have had the enlightening benefit of an opinion by the Superior Court, Cercone, JJ., in Janflone v. Janflone, 219 Pa. Superior Ct. 194, where the circumstances were much the same as here. The court in that opinion, recognizing the problems that have arisen from time to time because of the various concepts as referred to by counsel on both sides and by the court herein, reviewed the whole spectrum of custody cases and laid emphasis on that concept which has always guided this particular court in custody cases, and that is to state "the paramount consideration in child custody cases is the welfare of the child, and all other con-

siderations are subordinate," and went on to state that in determining the custody of a child as between its mother and its father, merely because the court finds the mother fit does not require a determination of custody in her favor, and the weight to be given a child's preference for one or the other of his parents is for the determination of the court below. We adjudicated the instant case without the benefit of Janflone, supra. It, however, supplies the authority for the reasoning of the trial judge and the philosophies applied, and the court therein concluded at pages 197-98, by quoting from the Doberstein case, supra, as follows:

"We have carefully reviewed the facts in this record and are satisfied that the decision of the court below was based on the sober judgment that the best interests of these children were served by remaining with their father; and that in deciding this, the established custody guides of fitness of the parties, preference of the minors, the children of tender years policy and the policy of keeping the family together, were all carefully weighed and balanced against the paramount question of the welfare of the children" and confirmed the award of custody to the father.

The occasions when this court over the years has awarded custody of children to the father as against the mother have been few and far between, but there comes a time when the welfare of the children requires the order as entered in this case, and we think the facts, the philosophy and the logic are on all fours with Janflone, supra, a carefully considered, well documented opinion, which provides the trial court with much needed guidelines.